**SIGNED THIS: July 5, 2016**

_____
**Mary P. Gorman
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | Case No. 14-70113 |
| SHERYLE HENRY, ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| SHERYLE HENRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 14-7021 |
| ) | |
| U.S. DEPARTMENT OF ) | |
| EDUCATION, ) | |
| ) | |
| Defendant. ) | |

# O P I N I O N

Before the Court is an adversary proceeding brought by Sheryle Henry ("Debtor") to determine the dischargeability of her student loan debt. Because the Debtor has failed to meet her burden of proof as to any of elements of "undue hardship," the student loan debt will be excepted from her discharge.

## I. Factual and Procedural Background

The Debtor commenced her Chapter 7 case on January 28, 2014 and received her discharge on May 19, 2014. She listed on her Schedule F - Creditors Holding Unsecured Nonpriority Claims $71,882.26 in student loans owed to Sallie Mae. On May 16, 2014, the Debtor filed a complaint against Sallie Mae to determine the dischargeability of her student loans. The Debtor amended her complaint three times, with the third amended complaint substituting the United States Department of Education ("Defendant") for Sallie Mae.

At the trial on the third amended complaint, the Debtor was the only witness to testify in person. The parties also stipulated to the admission of the evidence depositions of Dr. Eric Black, the Debtor's current psychiatrist, and Michael Illes, a student loan analyst for the Defendant.

The Debtor testified that she is 56 years old and unmarried. Although she has no legal dependents, her mother, who is seriously ill, lives with her. The Debtor suffers from a number of medical conditions. She is currently being treated for major depressive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, fibromyalgia, pain issues, and high cholesterol.

The Debtor also testified about her educational history. She obtained a secretarial certification in 1986. Then, in 1992, she earned an associate's degree

in general education. She earned a bachelor's degree in 2004 and, in 2009, after taking courses online, she earned master's degrees in business administration and public administration.

The Debtor financed much of her education with federal and federally-guaranteed student loans, the bulk of which were obtained for pursuit of her master's degrees. In 2013, the Debtor made six separate monthly payments of $105.71 on some of her loans. In December 2013, she obtained a loan of over $70,000 from the Defendant to pay off and consolidate her six outstanding student loans into a single obligation. The Debtor simultaneously entered into the Income Based Repayment Program ("IBR") but she filed her bankruptcy petition before making any IBR payments. The Debtor provided no testimony regarding any of her payment history before May 2013.

At the time she filed her bankruptcy petition, the Debtor was employed by the Illinois Department of Public Health as an office administrator with gross monthly wages of approximately $4500. After deductions for taxes, insurance, union dues, and retirement, her monthly take-home pay was about $2900. The Debtor testified she had been experiencing severe stress and anxiety related to her employment and had requested that her employer make several accommodations, including giving her a separate office or cubicle and providing her with a remote control so that she could open the main door to the office without having to leave her desk. Because the Debtor's requests for accommodations were denied, she left her job in September 2015 and went on disability leave. Her income now comes from disability payments of $2026 per month.

The Debtor testified that she is fully vested in her State of Illinois pension

and she is eligible to retire. If the Debtor were to retire, she estimates that her income would increase to between $2200 and $2400 per month. The Debtor stated that she does not currently plan to retire "because of what the State has done to" her. She also said she would be unable to perform her prior job even if the requested accommodations were now made because her mental health symptoms have worsened. The Debtor has not looked for work other than with the State of Illinois.

In addition to her disability income, the Debtor receives rental income from a second house that she owns and rents to a friend. She previously rented the house for $625 per month, but, in January 2016, she lowered the payment to $575 as a favor to the tenant. Her monthly mortgage, property tax, and insurance payments on the rental property are $515. The Debtor testified that she also recently began paying her tenant's utility bills of approximately $250 per month.

When she filed her bankruptcy petition in 2014, the Debtor's Schedule J itemized monthly expenses totaling $4,247.67. She did not provide an amended Schedule J; however, she has testified as to some changes to her expenses. On her amended Schedule B - Personal Property, the Debtor reported owning three vehicles—a 2006 BMW worth $13,000, a 2003 Jaguar worth $3600, and a 2000 Mazda Miata with minimal value. There was no unencumbered non-exempt equity in any of the vehicles. The disposition of the Jaguar is unknown but the Debtor testified that she traded in her BMW for a 2004 Mercedes, increasing her monthly payments from about $300 to about $450. She replaced the BMW because she thought that the car's wiring was about to go bad. The Debtor still has the Miata and, in July 2015, she purchased a Honda motor scooter for $1250.

The Debtor testified that she also spends a significant amount of money on family and friends. She gives her employed, 38 year old daughter about $1500 per year in cash. She also recently spent $1600 at an auction house to purchase a couch and other furniture for her daughter's new residence. She testified that she spends as much as $3500 per year to buy clothes for her grandchildren. The Debtor also provides most of her boyfriend's daily meals, as well as giving him approximately $400 in cash every year. The Debtor testified that her boyfriend earns between $3000 and $5000 annually, though she previously testified in a deposition that he earns $20,000 per year. Her boyfriend does not contribute to any of the Debtor's household expenses. Additionally, the Debtor incurred $16,000 in credit card debt since filing for bankruptcy, most of which was charged after she went on disability leave.

Dr. Black testified at his deposition that he began treating the Debtor in February 2015. Over the course of their relationship, Dr. Black diagnosed the debtor with major depressive disorder, generalized anxiety disorder, and attention deficit hyperactivity disorder-inattentive type. When Dr. Black saw the Debtor on October 30, 2015, she complained that she was still having problems with her work environment. Dr. Black testified that most of the Debtor's "anxiety was around work situations[.]" She "presented with similar complaints" at her appointment on November 30, 2015 and "[t]he psychosocial stressor of her work environment was generally unchanged[.]" At this time, Dr. Black was "under the impression that [the Debtor] may not have been working" although "[s]he made it sound like she was still having those issues at work." At her January 29, 2016 appointment, the Debtor reported to Dr. Black that she was still having problems

in her work environment, and was having difficulty concentrating at her work.

Additionally, Dr. Black testified that it would be difficult for the Debtor to return to her job without her requested accommodations, but with those accommodations, "it's more likely she could function" at work. Further, he believed that the Debtor would be able to take a job that is "low stress with minimal distractions [and] minimal interactions with people." Dr. Black also stated that "[t]here might be an end in sight to her stressors" related to work.

Michael Illes testified regarding the Debtor's borrowing history, payment history, and eligibility for income-sensitive loan repayment programs. He testified that the Debtor had received $71,367.93 in student loans, which was consolidated into a single loan in December 2013 with an annual interest rate of 4.875%. Six loans in total were consolidated, two of which were loans from the Defendant and four of which were federally-guaranteed private loans. The loans from the Defendant were incurred between August and October 2008. Mr. Illes testified that only one payment was made after the December 2013 consolidation, a payment of $1434.73 on February 9, 2016.[1] Mr. Illes also testified that the Debtor is eligible for income-driven loan repayment plans including IBR and REPAYE. Under either plan, she would pay a fixed percentage of her discretionary income each month, and any remaining balance would be discharged after 20 to 25 years. "Discretionary income" under these plans is based on adjusted gross income, with deductions made based on the poverty level and family size. Payments would be

---

[1] Neither Mr. Illes' nor the Debtor's testimony revealed the source of the $1434.73 payment. After reviewing the record in the Debtor's underlying bankruptcy case, it appears that the payment was made by the Debtor's Chapter 7 trustee as the Defendant's dividend from the bankruptcy estate.

calculated based on income in excess of approximately $18,000, with no payments required if the Debtor's income fell below that amount.

At the end of the trial, both parties presented brief closing arguments. The matter is now ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code, and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011). In their joint pre-trial statement filed September 30, 2014, both parties consented to the entry of a final judgment by this Court. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948 (2015).

## III. Analysis

A discharge under Chapter 7 of the Bankruptcy Code does not discharge a debtor's obligation to repay certain student loans "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents[.] 11 U.S.C. §523(a)(8). The Code does not define "undue hardship," but the Seventh Circuit has adopted the Second Circuit's *Brunner* test for determining the dischargeability of student loans. *Matter of Roberson*, 999 F.2d

1132, 1135 (7th Cir. 1993) (following *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)). Under the *Brunner* test:

> "[U]ndue hardship" requir[es] a three-part showing (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* (quoting *Brunner*, 831 F.2d at 396) (alterations in original). The Debtor has the burden to establish all three prongs of the *Brunner* test by a preponderance of the evidence. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002).

**A. The Debtor Did Not Meet Her Burden of Proof that She Cannot Maintain a Minimal Standard of Living While Repaying Her Student Loans.**

The first prong of the *Brunner* test analyzes "the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003) (citation omitted). For this prong, courts look at a debtor's current income and expenses, but disregard any unnecessary or unreasonable expenses that could be reduced to allow for payment of debt. *Larson v. United States (In re Larson)*, 426 B.R. 782, 789 (Bankr. N.D. Ill. 2010). Generally only necessary expenses—those required to provide for basic needs such as food, shelter, clothing, and medical care—are allowed but a debtor may also be entitled to limited expenditures for discretionary or recreational

purposes. *Id.* A debtor need not impoverish herself to pay her student loan debts, but, if necessary to pay her student loans, she is required to make "major personal and financial sacrifices and to live within a restricted budget." *Clark v. U.S. Dep't of Educ. (In re Clark)*, 341 B.R. 238, 249 (Bankr. N.D. Ill. 2006).

Here, the Debtor clearly established through her own testimony and that of Dr. Black that she suffers from several serious health problems that impact her ability to be gainfully employed. Dr. Black says that the Debtor can work, but only if significant accommodations are made by her employer. The Debtor currently is on disability leave from her employment with the State of Illinois and her gross income now is less than half of what she was making when she was fully employed. It is not disputed that the income side of the Debtor's budget has been adversely impacted by her health problems. But that finding alone does not establish the first prong of the *Brunner* test.

The Debtor did not present an amended Schedule J or a complete listing of her current monthly expenses at the hearing. Thus, it is unknown what the expense side of her budget now includes. When she initially filed her bankruptcy case and this adversary proceeding, she was making about $4500 gross per month from the State of Illinois, taking home about $2900 per month and spending about $3629 on her household expenses. She also was receiving $625 in rental income and claimed to be spending $618 for the mortgage payment on the rental property. But her budget included two car payments and significant amounts for cell phone service, transportation, and entertainment. At that time,

her student loan payment under the IBR program that she voluntarily entered into was $185 per month and undoubtedly could have been made without causing the Debtor any undue hardship.

At trial the Debtor testified that she recently traded in her BMW for a Mercedes, albeit a 2004 model, which has increased her car payment expense by $150 per month. She also purchased a motor scooter in the last year. The Debtor has continued her spending on family and friends, giving about $400 per year to her boyfriend and $1500 per year to her adult daughter. She admits to continuing to spend thousands of dollars each year on clothing for her grandchildren and furniture for her daughter. She also provides most of her boyfriend's meals at her sole expense, even though he has some income and could contribute to the cost. After going on disability leave, the Debtor voluntarily reduced the rent on her rental property and started paying her tenant's utility bills, resulting in at least a $200 loss each month on the property. The Debtor asks the Court to find that she is not capable of returning to work, even though she has resisted retirement, which could increase her monthly income by as much as $400.

As set forth above, the question to be answered under the first prong of the *Brunner* test is whether the Debtor can maintain a minimal standard of living "if forced to repay the loans[.]" *Roberson*, 999 F.2d at 1135. The Debtor has not offered the Court a clear picture of what it would actually mean for her to repay her loans. The Defendant asserts that the Debtor remains eligible for income-sensitive repayment plans, and that if she chose such a plan, because her income

has decreased, her payments would decrease as well. The Debtor is not required to remain on IBR either as a condition for discharge of her student loans or as a substitute for it. *See Krieger v. Educ. Credit Mgmt. Corp. (In re Krieger)*, 713 F.3d 882, 884 (7th Cir. 2013) (stating that student loan debtors need not always "agree to a payment plan and forgo a discharge"); *Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani)*, 311 B.R. 496, 509 (Bankr. N.D. Ill. 2004) (stating that income-sensitive repayment plans are not "a substitute for the thoughtful and considered exercise of" the bankruptcy court's discretion). What she must do, however, is provide the Court with sufficient information to determine whether making the loan payments would actually be an undue hardship. The Debtor has not done so. All of the testimony provided suggests that she continues to lead a lifestyle that is in no way "minimal." And because she appears to have significant disposable income to spend on her daughter, grandchildren, and boyfriend, she has not established that making a student loan payment would impose an undue hardship on her.

Based on the evidence presented, it is obvious that the Debtor has not made the sacrifices necessary to repay her student loans. She has sufficient income to own multiple vehicles, spend thousands of dollars on friends and family each year, and rent her real estate at a loss. Meanwhile, the Debtor has declined the opportunity to receive more money each month by retiring or by searching for a job with a different employer. The Debtor has not met her burden to prove that she is unable to maintain a minimal standard of living while repaying her student

loans.

### B. The Debtor Did Not Meet her Burden of Proof to Establish that her Situation is "Hopeless."

The second prong of the *Brunner* test requires a determination of "whether additional circumstances exist indicating that [the debtor's] state of affairs is likely to persist for a significant portion of the repayment period." *Goulet*, 284 F.3d at 778. This element is often described as requiring a "certainly of hopelessness." *Id.* Factors that can be considered include the debtor's age, education, job skills, and employment history, any significant physical or psychiatric impediments to securing employment, the size of the debt, and whether the debtor has any dependents. *See Krieger*, 713 F.3d at 884; *Goulet*, 284 F.3d at 778.

Several factors weigh in favor of the Debtor on this element. Based on the Debtor's testimony and that of her treating psychiatrist, there is no doubt that the Debtor's depression, anxiety, and ADHD make it more difficult for her to go back to work and remain employed. At the Debtor's age, repaying her student loans would take her well into retirement age. The debt, at over $70,000, is not a small burden on the Debtor's limited resources.

The Debtor, however, did not establish that she cannot maintain a minimal lifestyle if she is required to pay her student loans. And none of the testimony suggested that her situation would be likely to get worse over the coming years. To the contrary, there are obvious steps the Debtor could take to immediately

improve her situation. She could easily cut back on her spending, reduce her car payment by obtaining a more modest vehicle, return to at least break-even rental terms with her tenant, and require her boyfriend to contribute to the cost of his meals. She could retire and increase her income by several hundred dollars per month. Alternatively, she could look for employment that might be less stressful than the job she had with the State of Illinois.

The Debtor is not conducting herself as though she views her situation as hopeless. She continues to incur credit card debt and to spend excessively. She has two master's degrees and did not establish that she is not employable. The fact that the Debtor has some serious health problems and needs some accommodations to work does not render her hopeless. She did not meet her burden of proof that she will be unable to make payments on her student loans for a significant portion of the repayment period.

### C. The Debtor Has Not Met Her Burden of Proof that She Has Made a Good Faith Effort to Pay her Student Loans.

Finally, to obtain a discharge of her student loan debt, the Debtor must demonstrate that she has "made good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1136. There is no minimum percentage or amount of the loan that must be paid in order to show good faith, and debtors are not penalized for failing to make payments when they were unable to do so. *Clark*, 341 B.R. at 255. In addition to payment history, good faith is measured by a debtor's "efforts to obtain

employment, maximize income, and minimize expenses." *Roberson*, 999 F.2d at 1136. "The inquiry includes a determination of whether the debtor was negligent or irresponsible in conducting his financial affairs such that the debtor's misfortune is self-imposed." *Clark*, 341 B.R. at 255 (citation omitted).

Here, the Debtor has wholly failed to meet her burden to show her efforts to repay her loans. She first took out student loans in the 1990s to finance her associate's degree. In around 2000, the Debtor consolidated her loans—presumably those loans from the 1990s—to lower her interest payments. Then, she continued borrowing to finance degrees earned in 2004 and 2009 and consolidated for the last time in 2013, after which she immediately filed for bankruptcy. However, the Debtor offered no evidence of any payment history prior to 2013. It is simply impossible for the Court to conclude that the Debtor made a good faith effort to pay her student loans based only on six months of known payments.

Moreover, the Debtor has not made sufficient efforts to increase her income and minimize her expenses. To the contrary, the Debtor continues to spend significant amounts of money on her boyfriend, her daughter, and her grandchildren. She continues to own and incur expenses for multiple vehicles and she voluntarily operates her rental property at a loss. The Debtor could retire and earn more money each month or seek alternative employment, but has refused to consider doing either. At least in part, the Debtor's current financial problems are of her own making and she has not established that she has acted in good faith.

## IV. Conclusion

The Debtor has failed to meet her burden of proof on any of the three elements required to discharge her student loan debt under the *Brunner* test. By reducing her spending and either retiring or pursuing other employment, the Debtor would be able to maintain a minimal standard of living while repaying her student loans. Further, the Debtor has not demonstrated that she has made a good faith effort to pay her student loan debt in the past. The Debtor's obligation to repay her student loans will therefore not be discharged.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ###